UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| THE SIGNAGE FOUNDATION, <br> FOR COMMUNICATION <br> EXCELLENCE INC., <br><br>       Plaintiff <br><br>       vs. <br><br> AMERICAN PLANNING ASSOCIATION, <br><br>       Defendant | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Cause No. 3:01-CV-649RM |

OPINION AND ORDER

The Signage Foundation for Communication Excellence, Inc. sues the American Planning Association for breach of contract and fraud. The court's jurisdiction is based on the parties' diverse citizenship. 28 U.S.C. § 1332. The Signage Foundation originally sought an injunction against the APA's electronic publication of a planning advisory service manual called *Content-Sensitive Signage Design*. The manual grew out of a 1996 contract, amended in 1999, between the Signage Foundation and the Planning Association. After the first half of a bifurcated bench trial, the court rejected the APA's affirmative defense under the Indiana anti-SLAPP statute, IND. CODE § 34-7-7. Trial on the Signage Foundation's second amended complaint and the APA's counterclaim was conducted on September 15-17, 2004. On December 11, 2006, the court granted judgment as a matter of law to the Planning Association on the Signage Foundation's fraud claim, leaving the Signage Foundation's breach of contract claim and the Planning Association's counterclaim for resolution. The parties presented their final

arguments on January 22, 2007. This memorandum is intended to satisfy the court's obligation under Federal Rule of Civil Procedure 52 to make findings of fact and conclusions of law.

The Signage Foundation is an Indiana not-for-profit organization with its principal office located in Indiana. The Signage Foundation specializes in educational and informational efforts about on-premise signage and other forms of place-based communication, graphics and design systems.

The American Planning Association is a national nonprofit organization incorporated in the District of Columbia, which maintains its principal office in Chicago, Illinois. The Planning Association has more than 28,000 members, 46 chapters, and 16 specialty divisions. Through its Planning Advisory Service, the Planning Association produces research monographs called Planning Advisory Service reports on a variety of topics of interest to its subscribers. The Planning Association has prepared 460 such reports since 1949.

The seeds of this "Context-Sensitive Signage Design" project were sown in the fall of 1995, when Planning Association executive director Frank So was asked to speak to the Signage Foundation. The Signage Foundation's executive director, James Claus, began to discuss with Mr. So the possibility of the Planning Association preparing a publication in conjunction with, and funded by, the Signage Foundation. Signage is a more controversial topic at the local government level than the casual observer might realize. As Mr. So saw it, Mr. Claus believed that if the Planning Association published a report on the topic, it would help the signage industry deal with local governments.

On July 25, 1996, the Signage Foundation and Planning Association entered into a written agreement that provided a work program for a Planning Advisory Service report research project to be undertaken by the Planning Association to prepare a publication called "Context-Sensitive Signage Design." The Planning Association and the Signage Foundation were to fund the project jointly, with the Signage Foundation kicking in the much larger share. The Signage Foundation was to contribute $125,000 to the project, with the Planning Association contributing $20,000. The Signage Foundation also agreed to contribute one-half the cost — up to $20,000 — for printing and distribution, with the Planning Association matching the Signage Foundation's payment. Either party could terminate the contract for any reason on 30 days' written notice.

The contract contemplated a "best practices manual" for professional planners, public officials, the business community, and the sign industry, containing, among other things, an overview of current best practices in environmental graphic design; consideration of factors and criteria planners use in evaluating and regulating signs; a glossary of sign terminology; techniques for appraising the cumulative economic value of signs to businesses and communities; and sample state-of-the-art design guidelines and sign code provisions. The Planning Association was to distribute the report to some 1,700 public planning agencies, consultants, and institutions nationwide and sell it to the general public from its research library.

The contract created a steering committee of 9 members: 4 appointed by the Signage Foundation, 4 appointed by the Planning Association and a jointly

appointed chair. The steering committee was to guide the project, generate ideas about the report content, and comment on drafts. A separate document stated the steering committee's role to be to advance project objectives and help develop project products by advising the Planning Association. The contract and charter for the steering committee both provided that the Planning Association would retain full editorial control for the final product. Steering committee membership, according to the steering committee's charter, didn't imply a member's endorsement of the Planning Association's recommendations, work products, or services.

The contract and the steering committee's charter provided that the Planning Association would retain full editorial control for the final product and ultimate editorial control over the project's format and content. The contract listed ongoing projects and research publications in which the Planning Association was engaged, "most notable among these is GROWING SMART — a major, multi-year research initiative to help states modernize the statutes that govern planning and the management of change." The contract acknowledged that the Planning Association's research department often collaborated on research projects with organizations with similar interests.

The contract also provided that a panel of experts — unlimited in number and term — called a "resource group" would be formed to provide relevant information. The Planning Association assigned Marya Morris to write the report.

Dr. Claus wasn't a member of the steering committee, but he attended the meetings. Dr. Claus didn't like the direction the project began to take and voiced

his disagreements in ways that nettled the Planning Association people. Dr. Claus eventually was told to communicate with the Planning Association only in writing. The Planning Association twice considered canceling the project, but on both occasions decided to continue; the second occasion produced the 1999 amendment.

Under the original agreement, work was to commence on October 1, 1996 and be completed 24 months later. The Planning Advisory Service report was not completed within two years of October 1996, so on March 19, 1999, the parties executed an amendment to the contract that superseded the original budget and timetable. The Signage Foundation agreed to chip in another $37,000 in 10 monthly payments, and acknowledged that it still owed the Planning Association up to $20,000 as its half-share of the final printing costs. The steering committee was to conduct 2 more meetings to discuss chapters yet to be reviewed. In the interest of cost-reduction, the amendment eliminated the "Survey of Planning Agencies" and "Appendix C: Sample Design Guidelines and Sign Code Provisions." Planning Association researchers on the project agreed to meet with Mr. Yarger and industry representatives for hour-long meetings in Chicago. A new deadline of 18 months was set for the product to be ready for printing.

Disagreements between the Planning Association and the Signage Foundation over content led to failures to meet both the deadline set by the original contract and the deadline set by the amendment. Signage Foundation people insisted on the inclusion of material, especially material that Dr. Claus drafted, and Ms. Morris steadily refused to do so.

The contract called for a glossary and for a survey of planning agencies. Ms. Morris decided not to do those steps. She believed that defining terms as they arose throughout the text sufficed as a glossary. She believed that the 1999 amendment excused the requirement of a survey. Mr. Claus was especially concerned about the need to present the industry's view on amortization — a view directly the opposite from the Planning Association's position. Ms. Morris included a sidebar that she believed set forth the industry's view, but she refused to allow Dr. Claus to write the sidebar.

As the project neared completion, the Signage Foundation's Mr. Yarger told the Planning Association that the Signage Foundation would sue if the Planning Association included in the final version mention of certain materials the Planning Association had provided; Ms. Morris removed those references. The Planning Association told the Signage Foundation that if the industry wished, the Planning Association would remove all references to the industry's participation in the project. The Signage Foundation so requested, and it was done. While the work is still available for purchase from the Planning Association, it is not listed in the Planning Association's catalog of publications.

After the case was filed, and before the court addressed the anti-SLAPP defense, the Planning Association published the manual on its Web site. The Signage Foundation then voluntarily dismissed its claim for injunctive relief, leaving only its damages claims for breach of contract and fraud. The court granted judgment as a matter of law to the Planning Association on the fraud claim, leaving only the breach of contract claim. The Planning Association also

maintains a counterclaim for printing costs.

Neither party has argued that the case is controlled by the law of a state that differs from the law of the state of Indiana, so the court applies the law of Indiana, the forum state. *See* Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n., 805 F.2d 663, 681 (7th Cir. 1986) ("When the parties fail to consider the choice of law in a diversity case, the substantive law of the forum is presumed to control.") Under Indiana law, the essential elements of a breach of contract claim are "the existence of a contract, the defendant's breach thereof, and damages." McCalment v. Eli Lilly & Co., 2007 WL 258323, *8 (Ind.App. January 31, 2007). "A party breaches a contract either by placing itself in a position where it is unable to perform its contractual obligations, or by failing to perform all of its contractual obligations." Strodtman v. Integrity Builders, Inc., 668 N.E.2d 279, 282 (Ind.App. 1996)

The Signage Foundation has proven that the Planning Association breached the amended agreement in three ways. First, it failed to perform in a timely manner, missing both deadlines set for its performance. Such a breach provides no basis for recovery by the Signage Foundation, though, because the amendment amounted to a waiver of any claim arising from the missed first deadline, and the Signage Foundation's own conduct—specifically the incessant e-mails from Dr. Claus, and the ensuing need to respond, then the repetitive rehashing of the same arguments during steering committee review of the post-amendment work—caused the failure to meet the second deadline.

7

Second, the Planning Association failed to produce the glossary required by the original agreement. The amendment did not change the Planning Association's obligation to produce a glossary as part of the final product. The Planning Association argued that the same conduct by the Signage Foundation that delayed the project left the Planning Association with no time to prepare a glossary. The evidence does not support such a finding. Ms. Morris testified for hours without attributing the absence of a glossary to anything the Signage Foundation did. When asked why she did not include a glossary, she testified, "Because I defined terms throughout the report, and I didn't see a need to include something labeled a glossary that had sign terms. There's definitions of sign types. There's definitions of terms used in each of the chapters. The result accomplished the same thing." Transcript, Sept. 16, 2004, at 210. Perhaps Ms. Morris was right that her editorial approach accomplished the same thing, and under other circumstances, the agreement's reservation to the Planning Association of full editorial control might have warranted her approach. The Planning Association, however, contracted away whatever editorial right it might have had to fold the glossary into the text rather than adding a separate glossary. The failure to include a glossary constituted a breach of the agreement.

Third, the final product was not a "best practices manual," as the agreement required. At final argument, the Planning Association resisted this claim on the ground that the Signage Foundation needed to, but did not, present evidence as to what a "best practices manual" might be. There might be circumstances in

8

which expert guidance would be needed, but this is not such a case. The court found at the summary judgment stage that this was no best practices manual, and nothing in the post-summary judgment record is to the contrary.

The Signage Foundation needed no expert testimony because the author of the product stated, in an affidavit opposing a preliminary injunction, that the product was not a best practices manual:

> 4.  Contrary to Noel H. Yarger's affidavit . . . the Report produced under the Agreement, the Work Program, and the Amendment Agreement is not a "Best Practices Manual." The term "best practices" does not appear anywhere in the title or the text of the Report. The terms [sic] itself is subjective. The Report APA will publish contains information that the public currently does not have access to and that APA considers useful and informative to the public, to city planners, and to members of the sign industry. Recognizing that local communities ultimately must decide their own course of action as regards land use planning and sign regulation, all Planning Advisory Service Reports, including the one in question, contain background research, sample approaches to various land use issues, and case studies from communities around the U.S. Given the varying circumstances with respect to land use planning and the need for flexibility in the thousands of communities in this country, APA reports including the Context-Sensitive-Signage Design Report at issue here, do not proscribe nor do they advocate one single approach to any particular issue, and as thus, APA does not label, consider, or promote them as best practices manuals.

Aff. of Marya Morris, Docket #44, at 2.

Ms. Morris filed another affidavit later, when the Planning Association was opposing summary judgment, explaining that she meant the design report was not the best practices manual that the Signage Foundation wanted. Her summary judgment affidavit did not say that the design report was a best practices manual, and while she complained bitterly — probably justifiably — about the pressure the

9

Signage Foundation applied to get her to produce something setting forth only what the Signage Foundation considered the best practices, she offered no definition by which the ultimate product could be called a best practices manual.

Ms. Morris's later affidavit went on to explain her belief that the Planning Association could not have produced anything the Signage Foundation would have considered a best practices manual. Mr. Claus and Mr. Yarger struggled mightily to eliminate from the publication any reference to *Street Graphics*, another Planning Association publication with which the Signage Foundation had irreconcilable disagreement. Ms. Morris relegated *Street Graphics* to a single footnote reference and a single modest quotation; even that reference nearly derailed the entire project. The Signage Foundation — Dr. Claus, Mr. Yarger (and presumably others) had strong beliefs about what the publication's audience should be told. In some areas, Ms. Morris set forth the Signage Foundation's view as simply that: one point of view. The Signage Foundation saw its view as more than simply a point of view, and wanted its perspective set forth as fact; Ms. Morris did not believe she could do so, and the agreement's editorial control clause authorized her to decline to do so.

Resolution of this case does not require the court to decide whether the Signage Foundation's positions were points of view or probable truths, and the record before the court would not support any such determination. It is enough to find that the Planning Association not only did not produce the best practices manual the Signage Foundation hoped to see (which would not have been a

breach), it did not produce any sort of best practices manual. The agreements gave the Planning Association editorial control over the content of the best practices manual, as long as it produced a best practices manual. But the Planning Association produced no such manual. The contract required production of a best practices manual, and the Planning Association breached the agreements by producing something other than that.

The Signage Foundation paid $159,466 to the Planning Association under the agreements that the Planning Association breached, and incurred an additional $9,931.57 in travel and lodging expenses under the agreements. Because the Planning Association's breach of the agreements caused those damages, the Signage Foundation is entitled to judgment against the Planning Association in the sum of those amounts.

The Signage Foundation presented many hours of additional testimony and thousands of pages of additional exhibits in support of its fraud claim and in support of claims not properly part of the case. Findings on those issues are unnecessary. An award of prejudgment interest ordinarily accompanies a damages award for breach of contract because the amount of the damages ordinarily is easily calculated early on in the proceedings. Given the revolving door of attorneys for the Signage Foundation and the ever-changing theories of liability (as noted in the court's last order, the Signage Foundation's two trial attorneys presented conflicting theories on one or two issues), the Planning Association could not have known before final argument in this case of any easily calculated amount of

11

contract damages. Accordingly, the court awards no prejudgment interest.

The court finds for the plaintiff, The Signage Foundation for Communication Excellence Inc., and against the defendant, American Planning Association, on the plaintiff's breach of contract claim, and fixes the plaintiff's damages in the sum of $169,397.57. In light of the court's finding that the American Planning Association breached the contract at issue, the court also denies their counterclaim for printing costs. The clerk shall enter judgment accordingly.

SO ORDERED.

ENTERED:   February 5, 2007

                                              /s/ Robert L. Miller, Jr.
Robert L. Miller, Jr., Chief Judge
United States District Court